PULLMAN'S PALACE-CAR CO. v. CENTRAL TRANSP. CO.

CENTRAL TRANSP. CO. v. PULLMAN'S PALACE-CAR CO.

(Circuit Court, E. D. Pennsylvania. January 14, 1896.)

1. ULTRA VIRES LEASE—RESTITUTION—LOSS OF IDENTITY OF PROPERTY—MEASURE OF COMPENSATION.

   A sleeping-car company, operating a system of lines, leased the cars, contracts, etc., of another company, operating another system, and thereupon so merged and absorbed the plants of both companies into an entire system, by substitution of cars and of new contracts in its own name, that the identity of the plant of the lessor company was destroyed, and the plant itself could not be returned. After 15 years' possession the lessee company, without returning the property, repudiated the lease on the ground that it was ultra vires and void, and successfully defended on that ground against a suit for rental. In a proceeding in equity to compel the lessee company to make compensation for the property so appropriated, held, that the lessee company must pay the value of the property leased, as a whole, including contracts, and not merely the value of the tangible property, such as cars and equipments.

2. SAME.

   Held, further, that a valuation at a sum not above the selling price of the stock of the lessor company was not excessive.

**8. SAME—RENTALS AND EARNINGS—PRESUMPTIONS.**

*Held*, further, that as the lessee company had failed to furnish the information necessary to ascertain whether the earnings before the repudiation of the lease had been greater or less than the rental paid, the presumption was that the rent and earnings balanced each other, and that as the evidence justified the presumption that up to the time of repudiation the property had increased, rather than decreased, in value, a decree should be entered for the value found by the master, with interest from the time of repudiation.

## Hearing on Exceptions to Report of Master.

This was a bill in equity by Pullman's Palace-Car Company against the Central Transportation Company, and a cross bill by the Central Transportation Company against Pullman's Palace-Car Company. The two companies, plaintiff and defendant, had been sleeping-car companies, of about the same size, but occupying different territories; the Central Transportation Company operating a system of lines from St. Louis east to the Atlantic, and Pullman's Palace-Car Company operating a system of lines from Buffalo west to the Pacific. Negotiations entered into for consolidation resulted in a lease of the Central Transportation Company by Pullman's Palace-Car Company for 99 years, under a Pennsylvania statute specifically drawn by counsel for that purpose, and passed by the legislature. After the lease had been in operation 15 years, and after the Central Transportation Company's property had been so absorbed into the Pullman system that identification and separation had become impossible, the two companies quarreled over a clause of the lease. The Central Transportation Company brought suits at law to recover accruing installments of rent, and Pullman's Palace-Car Company filed the present bill, alleging that the lease had been terminated by it under a clause reserving that right, and that in any event it was originally invalid; alleging further that it was impossible to return the property, and asking the court to enjoin the suits at law, and ascertain what would be an equitable compensation for the property. The court granted an injunction against suits at law for further rental, but refused to interfere with pending suits for rental previously accrued. Pullman's Palace-Car Company thereupon set up as a defense to one of these pending suits at law the claim already made in the bill in equity, viz. that the lease itself was invalid. This defense the court sustained, and its decision was affirmed on appeal. Central Transp. Co. v. Pullman's Palace-Car Co., 139 U. S. 24, 11 Sup. Ct. 478. Thereupon Pullman's Palace-Car Company asked leave to dismiss the present bill, in. which it had asked the court to fix the compensation to be paid for the property in lieu of its return; and the Central Transportation Company opposed this motion, and asked leave to file a cross bill praying for compensation for the property taken. The motion to dismiss was refused, and leave was granted to file the cross bill. Pullman's Palace-Car Co. v. Central Transp. Co., 49 Fed. 261. Issue being joined, testimony was taken, and the cause heard on bill, answer, and proofs, with the result that a decree was entered in favor of the Central Transportation Company, and the cause referred to Theodore M. Etting, as master, to ascertain the value of the property. Pullman Palace-Car Co. v. Central Transp. Co., 65 Fed. 158.

The master reported that the Central Transportation Company was incorporated December 30, 1862, for 20 years, originally with a capital of $200,000, which from time to time had been increased until it reached $2,000,000 prior to the time of the lease, and which was still further increased at the time of the lease by the issue of $200,000 of stock for the purchase of patents, making a total capital of $2,200,000, and that it had a net earning capacity of 9½ per cent. per annum, increased to about 11½ per cent. per annum by the purchase of patents hereinafter mentioned, on which the company had been paying nearly $50,000 per annum royalty, and that it had a business which indicated a healthy growth. Its earnings were made by operating lines of sleeping cars extending from New York, Philadelphia, Baltimore, and Washington to Chicago and St. Louis. There were 16 written contracts with different railroads, covering the operation of most of these lines, but not all of them, as a few lines were operated without any written contract with the

railroads over which they extended.   Pullman's Palace-Car Company had been incorporated in 1867 with a capital of $1,250,000, subsequently increased to $1,750,000, and with net receipts equal to 13 per cent. per annum.   It operated lines under contracts with lines mostly north and west of Chicago, and extending to the Pacific Coast; but it had no means of reaching Philadelphia, Baltimore, or Washington from the west, and its only means of reaching New York was by the Grand Trunk & Michigan Central Railroad to Buffalo, and the Delaware, Lackawanna & Western Railroad to New York.   Its cars were superior in comfort and safety to those of the Central Transportation Company, and this fact affected travel on the lines of the latter company, especially those over the Pennsylvania Railroad and its affiliated companies. In addition to this, the entire condition of sleeping-car transportation at that time was unsatisfactory.   Passengers were obliged to change cars at points where the two systems came in contact with each other.   The Pennsylvania Railroad, and the roads forming its system, could not make contracts with Pullman's Palace-Car Company, because of the existing contracts with the Central Transportation Company.   There was pending litigation between the two companies, the Central Transportation Company claiming that the Pullman Company had infringed its patents.   Under these conditions, it appeared to be desirable, in the interests of both the sleeping-car companies, the railroads, and the public, that a consolidation of the two companies should be effected.   Negotiations resulted in: (1) A purchase by the Central Transportation Company of all the patents under which it had been operating at a royalty.   To enable this purchase to be made, the capital was increased from $2,000,000 to $2,220,000.   (2) A lease by the Central Transportation Company to the Pullman Company for 99 years, at a rental of 12 per cent. per annum on $2,220,000, and an assignment by the Central Transportation Company to the Pullman Company of all the former's cars, contracts, and patents.   (3) A contract between the Pullman Company and the Pennsylvania Railroad Company whereby the various contracts under which the Central Transportation Company had been operating lines over the roads comprising the Pennsylvania system were exchanged for a single 15-year contract in the name of the Pullman Company.   This contract allowed the equipment to be made up in part of the old Central Transportation Company cars, and in part of new cars to be furnished by the Pullman Company, the railroad undertaking to place the old cars in first-class condition.

To obtain legislative authority for the lease by one sleeping-car company to the other, the counsel for the Pennsylvania Railroad Company prepared a statute, which was passed by the Pennsylvania legislature, intended to authorize the lease, extend the corporate existence of the Central Transportation Company for 99 years, and authorize the issue of the $200,000 of new stock.   The effect of these agreements, as stated by the master, was: "The Pennsylvania Railroad obtained forthwith, for its entire system, Pullman cars and Pullman connections; agreeing, however, to accept, as a part of its new equipment, old cars of the Central Transportation Company, which were to be put in first-class condition.   The Central Transportation Company was thus saved from an expenditure necessary to provide a proper equipment of cars and better service, which, under other circumstances, would have been unavoidable, and received at once a sum exceeding its then earning power by about one-half of one per cent., and which payment, it was anticipated, it would continue to receive.   An harmonious system of sleeping-car transportation was thereby established, extending from the Atlantic to the Pacific, the receipts of which, it was believed, would be sufficiently large to secure the continuous payment of the above rental, and also to insure greater prospective value to the Central Transportation Company's shares.   The Pullman Company acquired an entrance to the principal cities of the Atlantic seaboard, by favored routes.   It at once took the place of the Central Transportation Company on the Pennsylvania lines, so called, for fifteen years, and also on the lines of all other railroad companies covered by the assigned contracts of the Central Transportation Company; and there was thus established reciprocal relations, which have, for the most part, since continued. It attained an ascendency in the sleeping-car business which has never since been disputed, as well as a monopoly of a most valuable territory for fifteen years."

The master further reported that, in all of the 16 contracts between the various railroads and the Central Transportation Company, the railroads were to furnish fuel and light, and keep the cars in good order and condition, and in some of them the railroads undertook to renew worn-out parts. Some of the contracts expired at definite dates, others ran for the life of the patents previously taken out. Six of them ran "during the continuance of the incorporation of" the Central Transportation Company. The master held that this included the continued corporate existence under the statute subsequently passed, extending the corporate life of the Central Transportation Company beyond the original limit of its charter. After the execution of the lease to the Pullman Company, some of the contracts were replaced by new ones taken in the name of the Pullman Company, and some were canceled. The master further reported that at the time of the lease the rolling stock of the Central Transportation Company consisted of about 119 cars and their equipments, of which the total cost was about $950,000, and the value at the time of the lease about $712,000, and that the Pullman Company had actually received from various railroads, in settlement of cars retired or destroyed, $556,-933.61, and had on hand 33 cars. The master reported, however, that, on account of the peculiar nature of the contracts, it was, in his judgment, impossible to correctly value the cars, apart from the obligations to maintain and use them set forth in the contracts. The master further reported that the value of the patents was $266,000,—that being the price paid for them at the time of the lease. He further reported that it was impossible to make a separate appraisal or valuation of the contracts, owing to their peculiar nature, and varying terms of duration. The master then proceeded to report the value of the property taken as a whole. He found that there were three measures of value, which served to check or verify each other, viz.: (1) The testimony of a witness who knew the property well, who was competent to appraise it, and who estimated it to be worth at least $3,300,000. (2) The market value of the stock of the company at the time of the lease, which was between $2,464,000 and $2,640,000. (3) The earning capacity of the property, taken in connection with the probable amount to be put aside to restore the capital on a fair expectancy of probable life, and this value the master estimated as at least $50 per share. The master then reported as follows: "The several forms of valuation above considered may be summed up as follows: If Torrey's valuation is to be adopted, the capital stock of the company was worth about seventy-five dollars a share. If the public estimate is to be adopted, the stock was worth from fifty-six dollars to sixty dollars a share. If the estimate predicated on earnings, coupled with probable life, is to be adopted, the stock was worth at least fifty dollars a share. The two latter estimates serve to verify each other, and to indicate that Torrey's testimony is excessive. They are both so far above the capitalized value of the rental agreed to be paid by the Pullman Company that either of them, if accepted, would leave a large margin for the illegal consideration which the court has directed shall be excluded from the account. Which of the two is to be preferred? And, if the price of the stock on the street is to be accepted as the measure of value of the property when transferred, what figure is to be adopted? The estimate of probable life is hypothetical. The value of the stock on the street is a positive indication of the estimate placed on the property by the public. That it is not entirely a satisfactory measure of value must be conceded, but in the judgment of the master, supported as it is by the best independent estimate that the evidence affords, it should be accepted as the fairest criterion of value. This amount has, according to the testimony, been placed at from fifty-six dollars to sixty dollars a share; and, whilst the evidence as to these values is not as satisfactory as the master would wish, it is nevertheless uncontradicted. As between the two quotations above named, which indicate the fluctuations of the stock in value, the master has taken the average, or, in other words, a valuation of fifty-eight dollars a share. This, he believes, is as fair and equitable a valuation as is possible, under the testimony; and he accordingly reports the value of the property, when received, is by him appraised at fifty-eight dollars a share, or $2,552,000." With regard to the earnings of the property after it had been delivered under the lease, the master reported: "An accurate ascertainment of the earnings, without further evidence than that which has been produced

before the master, is impossible. The plant, upon the execution of the lease, became absorbed in a system in which the elements of new contracts, additional cars, and added lines entered so largely that, from the evidence presented, it is not possible to distinguish accurately the earnings applicable to the property assigned. General results, therefore, can only be ascertained." The master then proceeded to discuss the contentions of the respective parties as to the earnings, under certain statements which had been produced, and held that neither estimate was satisfactory or complete. He then reported as follows: "The Pullman Company has failed, though requested by the master, to furnish him with such information, which would, he believed, have enabled him to state an account. In so doing, it has doubtless conformed to what its counsel have advised as the true interpretation of the order of reference, but the testimony furnished has not been sufficient to make it possible for the master to comply with the directions of the court, as they are understood by him; and he accordingly is compelled to report that he has not as yet been furnished with sufficient data to enable him to ascertain the difference between the rental paid to the Central Transportation Company from January 1, 1870, to January 1, 1885, and the receipts derived by the Pullman Company from its use of the property transferred during the period above referred to."

Both parties filed exceptions to this report. The Pullman Company prefaced its exceptions by a protest that the Central Transportation Company was not entitled to any recovery, and that the Pullman Company was protected by the statute of limitations. The exceptions, which were voluminous, covered substantially three objections, viz.: (1) That the Pullman Company was not accountable for the intangible property, such as contracts, etc.; (2) that the valuation was too high; (3) that the rents paid more than compensated for all the property received. There were numerous other exceptions to matters of detail, but the above comprehended the substantial objections. The exceptions of the Central Transportation Company were to the refusal of the master to find that the property was worth at least $3,000,000, and his failure to report that the failure of the Pullman Company to furnish the information necessary to state an account of earnings entitled the Central Transportation Company to a decree for the value of the property, without reference to the earnings. On the argument the Central Transportation Company, for the purpose of avoiding delay, offered to waive any claim for excess of earnings over the rental paid, and asked for a decree for the value of the property, with interest from the time when the Pullman Company repudiated the lease.

A. H. Wintersteen, Robert T. Lincoln, and Edward S. Isham, for Pullman's Palace-Car Co.

The contract under which the property was delivered having been adjudged void, the courts will leave the parties where they have placed themselves; and there can be, therefore, no recovery by the Central Transportation Company. The Pullman Company, if liable at all, was only liable for the property which was susceptible of manual transfer and physical delivery, to wit, the cars and equipments. The lease being void, so, also, was the assignment of contracts to the Pullman Company, and the Pullman Company therefore acquired nothing by the contracts. It was the duty of the Central Transportation Company to reassert its rights and take possession of the property, and its passivity and acquiescence in the situation were equally illegal with the lease itself. A party cannot recover for an injury which it was in his own power to prevent (Sedg. Dam. §§ 201, 202; Loker v. Damon, 17 Pick. 288; Dodd v. Jones, 137 Mass. 323; U. S. v. Smith, 94 U. S. 218), nor for an injury which it was its social duty to avoid (Miller v. Mariners' Church, 7 Me. 51). And no fiduciary relation could arise out of the mere possession and use of the property. Root v. Railway Co., 105 U. S., 215; Monk v. Harper, 3 Edw. Ch. 111; Doyle v. Murphy, 22 Ill. 508; Wilson v. Kirby, 88 Ill. 572. The valuation of the master is excessive because it capitalizes the earning-producing capacity of the plant, when the Central Transportation Company has received the earnings in the rental, and also because it includes the franchise of the corporation, which still exists. The legislature could not, by extending the corporate existence, extend a contract which would otherwise have expired at the end of the original incorporation.

### Frank P. Prichard and John G. Johnson, for Central Transp. Co.

If the master erred in his valuation, the error was in favor of the Pullman Company. A competent witness appraised the plant as worth at least $3,-000,000. It was earning 8 per cent. on this value, and with every prospect of increasing business. No witness was called by the Pullman Company to contradict this by any other appraisement of the plant as a whole. The master cut down this appraisement to $2,552,000, the selling value of the stock. If this is to be changed, it should, under the evidence, be raised, not lowered. The plant leased, consisting of cars, contracts, patents, etc., was absorbed by the Pullman Company into a new system, and its identity so destroyed by the establishment of new lines that it is impossible to separate or restore it, or even to identify its earnings. The Pullman Company has refused to furnish the information necessary to state an account, but there is sufficient evidence to raise almost a conclusive presumption that, up to the time when the Pullman Company repudiated the lease, the earnings were far more than the rental paid. Under the circumstances, the Central Transportation Company ought not to be put to the delay of another accounting; and, if it is willing to waive any claim for excess of earnings, it is entitled to a decree for the value of the property which the Pullman Company has appropriated.

### Before DALLAS, Circuit Judge, and BUTLER, District Judge.

BUTLER, District Judge. The master was appointed in pursuance of the opinion filed December 18, 1894, to ascertain the value of the property transferred and the amount of its earnings. He has found the value to be $2,552,000, and reports that no estimate of earnings can be made from the data furnished; that "the Pullman Company failed to produce, (though requested to do so,) evidence in its possession which he believes would have enabled him to state an account." Although both parties filed exceptions, the Transportation Company now seeks a decree for the $2,552,000, with interest from January 1st, 1885, when payment of rent ceased—waiving its claim to earnings, to avoid, (as it asserts,) further delay in obtaining a settlement. The Pullman Company stands on its exceptions, claiming, in substance, first, that it is not accountable for the intangible property, such as contracts with railroads, patent rights, etc.; second, that the valuation is too high; and third, that the rents paid more than compensate for all the property received.

The matter embraced in the first exception is covered by the opinion under which the master was appointed. It is not too late, however, to revive the question and continue the discussion; but we do not desire to add materially to what has been said. The argument drawn from the invalidity of the lease—that this instrument did not transfer this description of property—seems to be fallacious. The lease did not transfer any description of property. It was ineffectual for every purpose. The acts of the parties, however, transferred the property—the intangible as fully and effectually as all other. The counsel say no railway contracts valid "and obligatory in favor of the Pullman Company, upon the railways during the original or the extended life of the Central Company, or during the continuance of any patent rights, original or extended, or for any other period whatever, were ever received by the Pullman Company. The Central Company had definite contract rights for fixed and long periods of time, and enforceable against the railway companies. The Pullman Company did not acquire those, and the Central Company did not "part with"

them.   The Pullman Company got nothing enforceable upon the railways, either specially or by damages.   It acquired at best but a precarious status, terminable and destructible at any moment by the Central Company itself or by the state.   The attempted assignments passed no title, and no legal rights whatever."

This view was presented with force and earnestness. But the obvious answer is that the Pullman Company got the use and benefit of these contracts as completely as it did that of all other property named in the lease, operated its cars under them in some instances, in others surrendered them and obtained new contracts, in pursuance of the rights which they secured, and thus acquired complete possession of the Transportation Company's business, which it still holds and enjoys.   It is of no consequence that the railroad companies *might* have refused recognition of the Pullman Company; they did not. Like the parties to the lease, they believed it to be valid, treated the Pullman Company as lawful owner of the contracts, and accorded to it all the rights they secured.   To say that the Transportation Company might immediately have resumed possession of the contracts and continued the prosecution of its business, signifies nothing material to the circumstances.   The same might as justly be said respecting the cars, and other tangible property.   It is not true, however, that the possession might have been so resumed.   The Pullman Company would not have allowed it; and although the lease might have eventually been declared void, the property and business would have been absorbed in the meantime.   Both parties firmly believed the lease to be valid; they were so instructed by eminent counsel, and were therefore justified in the belief.   It was not until after the lapse of many years, when the property was irretrievably lost to the Transportation Company, that it had cause to doubt the validity of the lease.   It must not therefore be visited with knowledge of the invalidity, and the consequences of such knowledge, until the Pullman Company changed its position and raised the question.   To hold otherwise would work manifest injustice, by allowing the latter company, after standing on the lease until it had absorbed the property and business, to turn about and say, we had no right to it, you should not have permitted us to take it, and you therefore have no right to complain.

As respects the second exception, we think the valuation is not unjust to the Pullman Company.   The assertion that it includes the value of the Transportation Company's franchise is not well founded. It is true that the property is valued at its worth to the latter company, in view of the right to use it as the company did.   This right the Pullman Company could exercise by virtue of its own franchise, and did not, therefore, need the Transportation Company.   The value of the property to the Transportation Company and to the Pullman Company was, therefore, what the former lost and the latter gained by the transfer.   If the latter's gain was less than the former's loss, this might be, possibly, the proper measure of compensation.   There is no evidence, however, that it was less; the indications are that it was not.   If it was less the Pullman Company could have shown it.

The Transportation Company's franchise was simply rendered valueless by the transfer of its property. Its business was thus lost and its power to establish another destroyed.

As respects the third exception, we think the inference that the earnings were equal to the rent paid, is reasonable, if not unavoidable. If they were not, the Pullman Company, having possession of the evidence, could have shown it. The testimony produced by the Transporation Company was quite sufficient to put the burden on the other side. The failure to respond to the master's request greatly strengthens the inference. It is urged, however, that if the Pullman Company is charged with the property as of 1870, it must be treated thereafter as entitled to the earnings, and be credited with the amount subsequently paid as rent. Of course, if it is treated as owner from that date it could not justly be held accountable for earnings thereafter, and would be liable only for the value, with interest from that date, subject to the credit stated. But it is not so treated, and cannot be, because it would not correspond with the facts and would be unjust. The ownership of the property remained in the Transportation Company; the Pullman Company taking possession and holding it for the former, paying a stipulated price for its use up to 1885. The lease under which the parties acted was void, but this did not render the parties acts void. They chose to, and did, treat it as valid, and to the extent that its provisions were executed, the court will not interfere, except to prevent manifest injustice. Up to 1885 they were executed; the Pullman Company got and enjoyed the use and paid the stipulated price. Inasmuch, however, as the enjoyment of the use was granted, and the rent was paid therefor, in contemplation of a longer continuance of the arrangement, it was supposed that the rent might fall short of a just compensation for the use, or be in excess of such compensation. This was therefore considered a proper subject of inquiry. It is plain, however, that the parties substantially intended that the use and the rent should balance each other; and, in the absence of proof to the contrary, it should be presumed they did. It was not, therefore, until 1885, when the Pullman Company ceased to pay rent, and repudiated the arrangement, that it became practically responsible for a return of the property, or the payment of its value. Of course, it may be said that such responsibility actually existed from the beginning because the arrangement was unlawful. The parties, however, did not so understand, and treated it as lawful; and to the extent of what they thus did in good faith their acts will not be disturbed. It is too late now to treat the responsibility as existing in 1870, and make settlement accordingly. It would not only be in conflict with the facts, but would work manifest and very great injustice. It would enable the Pullman Company to set up the statute of limitations, as it did before the master;—and, if this failed, then to take the property for less than it agreed to pay and did pay, (interest considered) substantially as compensation for fifteen years of its use. It is the value of the property at the time it should have been returned that the Pullman Company should be charged with.

Inasmuch as this value would be difficult of ascertainment by the

Transportation Company except by reference to the value in 1870, it was considered proper to direct the inquiry to the latter date. Presumably the value increased; the evidence fully justifies the presumption. If it decreased the Pullman Company could and should have shown it. The master's valuation in 1870 is therefore to be taken as the value in 1885, when the property should have been returned. The payment of this sum, with interest from January 1, 1885, seems necessary to a just settlement; treating the value of the use and the rents paid prior to that date as balancing each other.

A decree may be prepared accordingly, dismissing the exceptions and confirming the report.

DALLAS, Circuit Judge. I concur in the foregoing opinion, and deem it unnecessary to further extend the discussion of the questions with which it deals; but may add that the result arrived at by the master, seems to me to be quite as favorable to the Pullman Company, as, upon any possible view of the facts and the law, could reasonably have been reached.